IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| J AND J SPORTS PRODUCTIONS,<br><br>    Plaintiff,<br><br>  v.<br><br>JOSEPH MARTIN COYNE,<br><br>    Defendant.<br>_____/ | No. C 10-04206 CRB<br><br>**ORDER RE MOTIONS FOR SUMMARY JUDGMENT AND DAMAGES** |

This case arises out of the display of a pay-per-view program at a commercial establishment. J & J Sports Productions ("J & J"), the commercial distributor of certain programs, sued Joseph Coyne, Rafael Hernandez, and 2X Play LLC (collectively "Double Play" or Defendant) for displaying the program at a commercial establishment without the proper licensing. Double Play moved for Partial Summary Judgment on the claims under 47 U.S.C. § 605, and 47 U.S.C. § 553. J & J cross-moved for Partial Summary Judgment on the 47 U.S.C. § 553 claim and the conversion claim. The Court GRANTS Double Play's motion on the 47 U.S.C. § 605 claim; GRANTS J & J's motion on the 47 U.S.C. § 553, and correspondingly DENIES Double Play's Motion on the § 553 claim; and GRANTS J & J's motion on the conversion claim. The Court also addresses the issue of damages. The Court will address fees and costs after further briefing from the parties.

## I. FACTUAL BACKGROUND

J & J is a distributor of sporting events nationwide. See Compl. (dkt. 1) ¶ 13. It obtained the exclusive commercial license to distribute "*Number One*": *Floyd Mayweather, Jr. v. Juan Maneul Marquez Championship Fight Program*" (the "Program"). Id. ¶ 11.

The Double Play, a commercial establishment, purchased the Program from its Comcast account. See Am. Answer (dkt. 40) ¶ 40. On September 19, 2009, Double Play contacted Comcast to inquire about the cost to receive and publish the Program, which Comcast represented to be $49.99 plus taxes. See Def.'s Am. Mot. for Summ. J. (dkt. 56) at 3. During this exchange, Comcast did not tell Double Play that it needed to contact J & J to purchase a commercial license for the Program. Id. During this same exchange, Double Play purchased the Program from Comcast and thereafter published it to patrons. Id. At all times, Double Play represented itself and was listed as a Comcast commercial customer. Id. at 7.

In his deposition, conducted through an interpreter, Defendant Rafael Hernandez does not provide a particularly clear explanation of the events leading up to the purchase. Mr. Hernandez stated that he is the 100% owner of 2X LLC, and that he purchased the company on August 1, 2009. Hernandez Depo (dkt. 80-1) at 8:12-22. At that time he took over management of the bar, including ultimate responsibility for the ordering of food, beer, wine, alcohol and creating promotions for Double Play. Id. at 20:22-21:4, 22:2-6. Hernandez stated that he did not have experience managing a bar before buying the Double Play, id. at 13-17, and that he does not know many other people who own restaurants or bars, id. at 35. He also stated that he did not know that he needed a special license to show fights in the bar. Id. at 52:4-7. When asked if he had ever licensed programming from a closed-circuit distributor, Mr. Hernandez replied, "No, not that I know of. I don't even know what that is." Id. at 35:16-19.

Mr. Hernandez stated that he was at the Double Play on September 19, 2009, and around 4:00 p.m. an advertisement for the Program came on one of the two televisions in the Double Play. Id. at 32-33. Mr. Hernandez stated, "[Bartender Christopher West] was looking at TV, and a commercial went on about the fight or something. And he asked if we

could put it on, and I said, 'I don't know.'" Id. at 32:7-9. Mr. Hernandez continued that Mr. West then called Comcast to see if he could order the fight, but that he does not remember whether he was at the bar when Mr. West placed the call. Id. at 33:9-34:7. He stated that he did not tell Mr. West he could not call Comcast, or that he was prohibited from ordering the fight. Id. at 33:8-12.

Mr. Hernandez also stated in his declaration that he answered "I don't know" in response to Mr. West's request to order the fight "because [he] had no knowledge of the relationship between the Double Play and Comcast. [He] had no idea if [he] would be allowed to pay for and then receive the Program." Hernandez Decl. (dkt. 83-3) ¶ 4. This was because he had not read the contract with Comcast, and did not know his rights for ordering pay-per-view events under the terms of the contract. Id. ¶¶ 2, 5. Finally, Mr. Hernandez stated, "I had no knowledge at all that I was doing anything improper when I allowed my bartender to call Comcast to order the Program. Certainly because I did not know if I was allowed to order the Program, if Comcast had refused the order, it would not have been shown at the Double Play." Id. ¶ 7.

Based on Double Play's receipt of the Program, J & J filed suit against Double Play, alleging four causes of action, including (1) violation of 47 U.S.C. § 605, (2) violation of 47 U.S.C. § 553, (3) conversion, and (4) violation of California Business and Professions Code § 17200. See generally Compl. (dkt. 1).

Double Play moved for Partial Summary Judgment on the claims under 47 U.S.C. § 605 and 47 U.S.C. § 553, and J & J filed a Cross-Motion for Partial Summary Judgment on the claim under 47 U.S.C. § 553 and the conversion claim.

## II. LEGAL STANDARD

### A. Summary Judgment

Summary judgment is appropriate when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56©. An issue is "genuine" only if there is sufficient

3

evidence for a reasonable fact finder to find for the non-moving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986). A fact is material if the fact may affect the outcome of the case. See id. at 248.

"In considering a motion for summary judgment, the court may not weigh the evidence or make credibility determinations, and is required to draw all inferences in a light most favorable to the non-moving party." Freeman v. Arpaio, 125 F.3d 732, 735 (9th Cir. 1997). A principal purpose of the summary judgment procedure is to identify and dispose of factually unsupported claims. See Celotex Corp., 477 U.S. 317, 323-24 (1986).

The party moving for summary judgment bears the initial burden of identifying those portions of the pleadings, discovery, and affidavits which demonstrate the absence of a genuine issue of material fact. See id. at 323. Where the moving party will have the burden of proof on an issue at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. See id.

Once the moving party meets this initial burden, the non-moving party must go beyond the pleadings and by its own evidence "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The non-moving party must "identify with reasonable particularity the evidence that precludes summary judgment." Keenan v. Allan, 91 F.3d 1275, 1279 (9th Cir. 1996) (quoting Richards v. Combined Ins. Co., 55 F.3d 247, 251 (7th Cir. 1995), and noting that it is not a district court's task to "scour the record in search of a genuine issue of triable fact"). If the non-moving party fails to make this showing, the moving party is entitled to judgment as a matter of law. See Celotex Corp., 477 U.S. at 323.

**B.     Damages**

A party aggrieved under 47 U.S.C. § 553 may, at its discretion, recover either actual or statutory damages. 47 U.S.C. § 553(c)(3)(A). Under § 553(c)(3)(A)(ii), the "party aggrieved may recover an award of statutory damages for all violations involved in the action, in a sum of not less than $250 or more than $10,000 as the court considers just." Additionally, under § 553(c)(3)(B), "[i]n any case in which the court finds that the violation

4

was committed willfully and for purposes of commercial advantage or private financial gain, the court in its discretion may increase the award of damages, whether actual or statutory under subparagraph (A), by an amount of not more than $50,000." Finally, under § 553(c)(3)(C), "[i]n any case where the court finds that the violator was not aware and had no reason to believe that his acts constituted a violation of this section, the court in its discretion may reduce the award of damages to a sum of not less than $100."

Damages for conversion are based on the value of the property at the time of the conversion. Krueger v. Bank of America, 145 Cal. App. 3d 204, 215 (1983).

Under 47 U.S.C. § 553(c)(2)(C), "[t]he court may – direct the recovery of full costs, including awarding reasonable attorneys' fees to an aggrieved party who prevails."

## III. DISCUSSION

### A. Section 605

The Federal Communications Act, 47 U.S.C. § 605 et seq., prohibits unauthorized receipt, publication, or use of satellite cable programming.[1] See 47 U.S.C. § 605(a). The Act allows an aggrieved party to bring a civil action in federal district court and permits that

---

[1] Section 605 states in pertinent part: "Except as authorized by chapter 119, Title 18, no person receiving, assisting in receiving, transmitting, or assisting in transmitting, any interstate or foreign communication by wire or radio shall divulge or publish the existence, contents, substance, purport, effect, or meaning thereof, except through authorized channels of transmission or reception, (1) to any person other than the addressee, his agent, or attorney, (2) to a person employed or authorized to forward such communication to its destination, (3) to proper accounting or distributing officers of the various communicating centers over which the communication may be passed, (4) to the master of a ship under whom he is serving, (5) in response to a subpoena issued by a court of competent jurisdiction, or (6) on demand of other lawful authority. No person not being authorized by the sender shall intercept any radio communication and divulge or publish the existence, contents, substance, purport, effect, or meaning of such intercepted communication to any person. No person not being entitled thereto shall receive or assist in receiving any interstate or foreign communication by radio and use such communication (or any information therein contained) for his own benefit or for the benefit of another not entitled thereto. No person having received any intercepted radio communication or having become acquainted with the contents, substance, purport, effect, or meaning of such communication (or any part thereof) knowing that such communication was intercepted, shall divulge or publish the existence, contents, substance, purport, effect, or meaning of such communication (or any part thereof) or use such communication (or any information therein contained) for his own benefit or for the benefit of another not entitled thereto. This section shall not apply to the receiving, divulging, publishing, or utilizing the contents of any radio communication which is transmitted by any station for the use of the general public, which relates to ships, aircraft, vehicles, or persons in distress, or which is transmitted by an amateur radio station operator or by a citizens band radio operator." 47 U.S.C. § 605(a).

5

party to elect an award of either statutory or actual damages. See 47 U.S.C. § 605(e)(3)(C)(I).

Jurisdictions have split regarding the applicability of § 605 to cases involving the unauthorized receipt, publication, or use of satellite cable programming intercepted from a cable system as opposed to a satellite system.[2] Although the Ninth Circuit has yet to decide the issue, some of the most recent decisions coming from the Northern District of California have determined that § 605 and § 553 are mutually exclusive rather than overlapping.[3] On the other hand, several district courts have found a single act may violate both § 605 and § 553, at least where it was uncertain whether the interception occurred from a cable or satellite system. See, e.g., Joe Hand Promotions, Inc. v. Pete, No. 99-01531, 1999 WL 638215, at *1 (N.D. Cal. Aug. 17, 1999).

Although J & J points out the lack of consensus within the Ninth Circuit regarding the applicability of § 605 to this case, J & J does not appear to oppose Double Play's Motion for Partial Summary Judgment on the § 605 claim. See Pl.'s Opp'n (dkt. 59) at 5 ("Nonetheless, to the extent required, in light of the judicial admission of receiving the Program from

---

[2] Compare Int'l. Cablevision, Inc. v. Sykes, 75 F.3d 123 (2d Cir. 1996) with U.S. v. Norris, 88 F.3d 462 (7th Cir. 1996). In Sykes, the court concluded that § 605 applies to cases involving any radio transmissions, whether or not they are intercepted from a cable or satellite system, whereas "§ 553 applies to any transmissions via cable, whether or not they originate as radio transmissions." See Sykes, 75 F.3d at 133. In contrast, the Norris court concluded that § 605 only applies to cases involving radio transmissions intercepted from a satellite system, whereas § 553 applies to cases involving radio transmissions intercepted from a cable system. See Norris, 88 F.3d at 468.

Although several district courts have followed the Sykes approach, no cases at the circuit level have adopted the Sykes approach. On the other hand, both the Third and First Circuits have adopted the Norris approach. See TKR Cable Co. v. Cable City Corp., 267 F.3d 196, 207 (3rd Cir. 2001) ("We therefore conclude that § 605 encompasses the interception of satellite transmissions 'to the extent reception or interception occurs prior to or not in connection with, distribution of the service over a cable system,' and no more."); Charter Commc'ns Entm't v. Burdulis, 460 F.3d 168, 176 (1st Cir. 2006) ("Since § 553 was enacted to combat the theft of all 'communications by wire,' and not merely non-video services that can travel over cable, we think that the provisions of § 553 were intended by Congress to be the primary protections for cable communications . . . such protections would be superfluous if § 605 also provided protection to certain 'communication[s] by wire.'").

[3] See J & J Sports Productions, Inc. v. Ro, No. 09-2860, 2010 WL 668065, at *3 (N.D. Cal. Feb. 19, 2010); J & J Sports Productions, Inc. v. Marcaida, No. 10–5125, 2011 WL 2149923, at *2 (N.D. Cal. May 31, 2011); J & J Sports Productions, Inc. v. Guzman, No. 09-5124, 2010 WL 4055934, at *2 (N.D. Cal. Oct. 14, 2010); J & J Sports Productions, Inc. v. Doan, No. 08-0324, 2008 WL 4911223, at *2 (N.D. Cal. Nov. 13, 2008); J & J Sports Productions, Inc. v. Manzano, No. 08-1872, 2008 WL 4542962, at *2 (N.D. Cal. Sept. 29, 2008).

Comcast, Plaintiff now agrees that liability is proper under 47 U.S.C. § 553."). Thus, this Court need not finally decide the issue at this time. Accordingly, the Court GRANTS Double Play's motion for summary judgment on the § 605 claim.

**B.     Section 553**

**1.     Merits**

The Federal Cable Communications Policy Act, amended by the Cable & Television Consumer Protection and Competition Act of 1992, 47 U.S.C. § 553, prohibits the unauthorized receipt or interception of communications offered over a cable system.[4] See 47 U.S.C. § 553. Section 553 creates a civil cause of action for an aggrieved party and permits the plaintiff to choose between actual and statutory damages. See 47 U.S.C. § 553(c)(3)(A).

The final clause of § 553(a)(1) specifies that one who intercepts communication offered over a cable system violates the statute "unless specifically authorized to do so by a cable operator." 47 U.S.C. § 553(a)(1). Because many of the cases alleging violation of § 553 involve the purposeful interception of cable programming through blackboxes or result in default judgments, the question whether the defendant was specifically authorized is either so obvious that it does not need explanation or is not raised at all.

The few cases that do address the question whether a commercial customer's interception was authorized by a cable provider do not present a uniform answer. For example, one district court has held that a cable operator cannot authorize interception by a commercial establishment. Nat'l. Satellite Sports, Inc. v. Time Warner Entm't Co. L.P., 217 F. Supp. 2d 466, 468 (S.D.N.Y. 2002) ("For a cable operator lawfully permitted to broadcast a fight to residential customers to allow its services to permit commercial establishments to tap-in to the broadcast without paying the party that holds the exclusive right to broadcast the fight commercially is not an authorization a cable operator can give, under § 553 or otherwise").

---

[4] Section 553(a) states in pertinent part: "No person shall intercept or receive or assist in intercepting or receiving any communications service offered over a cable system, unless specifically authorized to do so by a cable operator or as may otherwise be specifically authorized by law." 47 U.S.C. § 553(a)(1).

7

However, in another case where a cable operator allowed a commercial establishment to receive a pay-per-view program over which a satellite operator owned the exclusive commercial distribution rights, the court held the commercial establishment was specifically authorized by the cable operator and that there was no § 553 violation. J & J Prods., Inc. v. Schmalz, 745 F. Supp. 2d 844, 851 (S.D. Ohio 2010) ("Nowhere in this language [of § 553(a)(1)] is the term 'cable operator' qualified with language indicating that the cable operator must be an 'authorized' cable operator. We believe this to be a relevant distinction."). The Schmalz court noted several factors influencing its decision, including (1) the fact that the commercial establishment was listed and represented itself as a commercial establishment at all relevant times; and (2) the licensing agreement between the licensor and cable operator obligated the cable operator to disclose to the commercial establishment that it was not authorized to transmit the program to commercial establishments, which it failed to do, and thus the commercial establishment was not aware and could not reasonably be aware that the cable operator was not authorized to distribute the program to it. See id. Although J & J argues that the Schmalz decision was anomalous, the cases it cites do not actually support its contention.[5]

Notwithstanding Schmalz, the Court finds the transmission was not authorized. Although Double Play was listed and represented itself as a commercial establishment at all relevant times, it knew or reasonably should have been aware that Comcast was not in a position to authorize it to transmit the Program. This is because Double Play's Business

---

[5] J & J cites Joe Hand Promotions, Inc. v. Easterling, No. 08-1259, 2009 WL 1767579 (N.D. Ohio Jun. 22, 2009); Kingvision Pay Per View v. Thiaf, No. 05-2391, 2006 WL 2078427 (N.D. Ga. Jul. 24, 2006); Kingvision Pay-Per-View v. Guerrero, No. 08-1970, 2009 WL 1973285 (N.D. Tex. Jul. 7, 2009); Joe Hand Promotions v. Young, No. 09-0157, 2010 WL 1979388 (W.D. Ky. May 14, 2010). Pl.'s Opp'n (dkt. 59) at 8. In Easterling and Young, defendants were mistakenly listed as residential customers when they purchased the unauthorized program, unlike in this case where Double Play was correctly listed as a commercial establishment when it purchased the Program. See Easterling, 2009 WL 1767579, at *3; Young, 2010 WL 1979388, at *1. Although plaintiffs in Thiaf and Guerrero filed motions for summary judgment like in this case, their motions were unopposed and there was no showing that the defendants in those cases dealt with a cable operator or any intermediate programming provider like in this case. See Thiaf, 2006 WL 2078427, at *1; Guerrero, 2009 WL 1973285, at *1.

Services Customer Terms and Conditions Agreement (the "TAC Agreement")[6] with Comcast made clear that Comcast did not have the right to authorize Double Play's dissemination of the Program.

Article 21.1 (entitled "Redistribution Limitation") of the TAC Agreement states in pertinent part:

> Customer hereby acknowledges and agrees that Comcast does not have the absolute right to distribute pay-per-view video programming (including programming such as sporting events); and certain premium video services to commercial establishments. Therefore, Customer agrees that it shall not exhibit nor assist in the exhibition of any such programming unless explicitly authorized to do so, in advance and in writing, by Comcast and the applicable program or event distributor. In requesting such explicit authorization, Customer agrees to identify itself as a commercial establishment. Riley Decl. (dkt. 57-1) Ex. A (Business Services Customer Terms and Conditions), 13.

The TAC Agreement not only disclosed that "Comcast does not have the absolute right to distribute pay-per-view video programming (including programming such as sporting events)" but also obligated Double Play to obtain authorization "in advance and in writing, by Comcast <u>and the applicable program or event distributor</u>." <u>Id.</u> (emphasis added).

Double Play argues that by representing itself as a commercial establishment when it sought to purchase the Program from Comcast on September 19, 2009, it performed its obligations in Article 21. 1 of the TAC Agreement.[7] Def.'s Opp'n (dkt. 58) at 6. However,

---

[6] J & J requests the Court take judicial notice of the TAC Agreement pursuant to Federal Rule of Evidence 201. See Pl.'s Motion for Summ. J. at 8 n. 6. Federal Rule of Evidence 201 permits a court to take judicial notice of facts that are "not subject to reasonable dispute in that [they are] either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot be reasonably questioned." Fed. R. Evidence 201(b). Because the TAC Agreement is "capable of accurate and ready determination by resort to sources whose accuracy cannot be reasonably questioned," and Double Play does not contest J & J's request, the Court GRANTS the request to take judicial notice of the TAC Agreement.

[7] Double Play does not argue that its exchange with Comcast on September 19, 2009 constituted a modification of Article 21.1 of the TAC Agreement. See Def.'s Opp'n (dkt. 58) at 6. Even if Double Play had argued its exchange with Comcast constituted a modification of the agreement, Double Play's exchange with Comcast would not have constituted a valid modification of the agreement.

The TAC Agreement includes terms and conditions for modifying the agreement in Article 13.5 (entitled "Entire Understanding"), which states in pertinent part: "Terms or conditions contained in any purchase order, or restrictive endorsements or other statements on any form of payment, shall be void and of no force or effect. Only specifically authorized representatives of Comcast may make modifications to this Agreement or this Agreement's form. No modification to the form or this Agreement made by a representative of Comcast who has not been specifically authorized to make such modifications shall be binding upon Comcast. No subsequent agreement among the parties concerning the Services shall be effective or binding unless it is executed in writing by authorized representatives

because Double Play did not obtain authorization in advance and in writing from J & J, it failed to satisfy its obligation in Article 21.1 of the TAC Agreement. Def.'s Opp'n (dkt. 58) at 6. As Double Play does not contest the validity of the TAC Agreement, the disclosure and obligations set forth in the agreement will be enforced.[8]

In sum, J & J is entitled to summary judgment on its section 553 claim. The undisputed facts show that Double Play intercepted the Program without authorization. Accordingly, the Court GRANTS J & J's motion for summary judgment on the section 553 claim and DENIES Double Play's motion on this claim.

### 2. Damages

Here, J & J has elected to receive statutory damages. See Damages Memo (dkt. 80) at 2 ("Plaintiff requests statutory damages pursuant to 47 U.S.C. § 553(c)(3)(A)(ii)."). Plaintiff also requests enhancement damages under § 553(c)(3)(B). Defendant argues the statutory damages should be reduced to $100 pursuant to § 553(c)(3)(C). I will examine each request in turn.

#### a. Statutory Damages under § 553(c)(3)(A)(ii)

Under § 553(c)(3)(A)(ii), the "party aggrieved may recover an award or statutory damages for all violations involved in the action, in a sum of not less than $250 or more than $10,000 as the court considers just." The court of appeals has not set forth specific factors to use in determining the appropriate amount of such enhancements. See J & J Sports Prods., Inc. v. Concepcion, No. 10-5092, 2011 WL 2220101, at *4 (N.D. Cal. June 7, 2011). "District courts have thus considered different factors to determine culpability and to achieve

---

of both parties." Riley Decl. (dkt. 57-1) Ex. A (Business Services Customer Terms and Conditions), 9.

There is no showing that the Comcast representative whom Double Play contacted was specifically authorized to make modifications to the TAC Agreement. Although Comcast's invoice to Double Play listed the price for Double Play to purchase the Program as $49.99 plus taxes, the listed price is a term or statement on a "form of payment" and thus has "no force or effect" on Comcast. Thus, there was no modification to the TAC Agreement.

[8] It appears that Double Play acted in good faith when it purchased the Program from Comcast by contacting Comcast and asking how it could go about obtaining the Program. But that good faith does not affect Double Play's liability under § 553. However, the Court may take Double Play's good faith into account when it sets damages. See 47 U.S.C. § 553(c)(3)(A)(ii).

10

proper compensation and deterrence. These include: use of cover charge, increase in food price during programming, presence of advertisement, number of patrons, number of televisions used, and impact of offender's conduct on the claimant. Repeated violations may also justify enhanced damages." Id.

J & J argues that the goal of piracy awards is deterrence. See Joe Hand Promotions, Inc. v. Gamino, 2011 WL 66144 (E.D. Cal. Jan. 10, 2011). Thus, it argues it is not as relevant that there were only 10-18 patrons at the bar. Damages Memo at 4, 6. Moreover, J & J argues that courts have also given it larger awards even when the showing had minimal impact on J & J. Id. at 6 (citing J & J Sports Prods., Inc. v. Oliveres, 2011 WL 587466, at *3 (E.D. Cal. Feb. 9, 2011)).

Here, the Program was shown on one 42 inch television, to about 10-18 patrons. Marino Decl. (dkt. 57-2). There is no evidence that Double Play advertised the fight at all (indeed, this would be difficult as Mr. Hernandez testified he and Mr. West saw the ad only about 1-2 hours before the fight began). There is no evidence Double Play charged a cover charge to watch the fight, that there was an increase in food price during the Program, or that this was a repeat violation.

Thus, the Court awards the minimum statutory damages of $250 in this case.

### b. Enhancement of Damages under § 553(c)(3)(B)

Under § 553(c)(3)(B), "[i]n any case in which the court finds that the violation was committed willfully and for purposes of commercial advantage or private financial gain, the court in its discretion may increase the award of damages, whether actual or statutory under subparagraph (A), by an amount of not more than $50,000." J & J argues the Court should apply such an enhancement here. In support of this, it points to Mr. Hernandez's testimony that he is in charge of the Double Play, and answered "I don't know" in response being asked if the bar could order the fight. Damages Memo at 4. J & J argues this demonstrates that at the least, Mr. Hernandez was unsure of whether he could order the fight, and did not take action to find out whether the action was lawful. Id.

1    Defendant does not make a specific response to these contentions, instead attaching
2 the transcript from this Court's September hearing. Still, there is not evidence here that the
3 violation was committed willfully and for purposes of commercial advantage. Mr.
4 Hernandez had not read his contract with Comcast. Hernandez Decl. ¶ 2. He logically
5 assumed that if he was not able to order the fight through Comcast, Comcast would not let
6 him do so. Id. ¶ 7. While he did arguably have constructive knowledge of the contract, and
7 such constructive knowledge comes into play with regards to the downward departure and
8 conversion claims discussed below, it does not give rise to a "willful" violation. Thus, the
9 Court declines to award any enhancement damages.

### c. Reduction under § 553(c)(3)(C)

11    Under § 553(c)(3)(C), "[i]n any case where the court finds that the violator was not
12 aware and had no reason to believe that his acts constituted a violation of this section, the
13 court in its discretion may reduce the award of damages to a sum of not less than $100."
14 Here, Mr. Hernandez was clearly not aware that his acts constituted a violation of the law.
15 Still, arguably he did not have "no reason to believe" so. The terms of the contract with
16 Comcast stated: "Customer hereby acknowledges and agrees that Comcast does not have the
17 absolute right to distribute pay-per-view video programing (including programming such as
18 sporting events); and certain premium video services to commercial establishments.
19 Therefore, Customer agrees that it shall not exhibit nor assist in the exhibition of any such
20 programming unless explicitly authorized to do so, in advance and in writing, by Comcast
21 and the applicable program or event distributor." Riley Decl. (dkt. 57-1) Ex. A (Business
22 Services Customer Terms and Conditions) at 13 (emphasis added). Thus, if Mr. Hernandez
23 had read the contract, he would have had reason to believe that his acts might constitute a
24 violation. Thus, the Court declines to reduce the damages from $250 to $100.

### C. Conversion

#### 1. Merits

27    Under California law, conversion has three elements: (1) ownership or right to
28 possession of property; (2) wrongful disposition of the property right of another; and (3)

12

damages. See G.S. Rasmussen & Assocs., Inc. v. Kalitta Flying Serv. Inc., 958 F.2d 896, 906 (9th Cir. 1992). Although conversion generally applies to tangible property, recent court decisions have recognized intangible property such as the exclusive distribution rights over a program may be capable of being converted. See Don King Prods./Kingvision v. Lovato, 911 F. Supp. 419, 423 (N.D. Cal 1995).

California law also recognizes a good faith purchaser defense if a party can show he (1) paid value for the property; (2) purchased it in good faith; and (3) without actual or constructive notice of another's rights to the property. Oakdale Vill. Grp. v. Fong, 43 Cal. App. 4th 539, 547 (1996). A party purchases in good faith if the purchase is "honestly conceived and consummated without collusion, fraud, or knowledge of fraud, and without intent to assist in a fraudulent or otherwise unlawful design." Heney v. Sutro & Co., 28 Cal. App. 698, 702 (1915). Constructive notice is "knowledge of facts and circumstances sufficient to put a prudent purchaser on inquiry" as to another's rights to the property. Oakdale Vill. Grp., 43 Cal. App. 4th at 549.

J & J owned the exclusive commercial distribution rights over the Program. See Compl. (dkt.1) ¶ 13. Double Play's unauthorized receipt of the Program wrongfully disposed of J & J's property right, and J & J suffered damages by losing the profit it would have obtained in selling a sub-license fee for the Program to an establishment similar in size to Double Play. Id. ¶ 12-13. Thus, J & J has shown the three elements of conversion.

Double Play purchased the Program for value at $49.99 plus taxes. See Def.'s Am. Answer (dkt. 40) ¶ 40. As there is no showing of collusion, fraud, or knowledge of fraud, Double Play purchased the Program in good faith. However, because Double Play had constructive notice of J & J's property right via the Comcast contract, Double Play cannot support a good faith purchaser defense. Accordingly, the Court GRANTS J & J's motion for summary judgment on the conversion claim.

### 2. Damages

Damages for conversion are based on the value of the property at the time of the conversion. Krueger v. Bank of America, 145 Cal. App. 3d 204, 215 (1983). Thus, the

Court awards J & J $2,200 in conversion damages – the price for a commercial establishment to broadcast the program through J & J.

### D. Costs and Attorneys' Fees

Under 47 U.S.C. § 553(c)(2)(C), "[t]he court <u>may</u> – direct the recovery of full costs, including awarding reasonable attorneys' fees to an aggrieved party who prevails." (emphasis added). The Court will decide the issue of costs and fees after further briefing from the parties.

## IV. CONCLUSION

For the foregoing reasons, the Court GRANTS Double Play's motion on the section 605 claim; GRANTS J & J's motion on the section 553 claim; DENIES Double Play's motion on the section 553 claim; and GRANTS J & J's motion on the conversion claim.

**IT IS SO ORDERED.**

Dated: March 7, 2012

CHARLES R. BREYER
UNITED STATES DISTRICT JUDGE

14